IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 6, 2007 Session

## STATE OF TENNESSEE v. RICHARD WAYNE HAMPTON

**Direct Appeal from the Circuit Court for Carroll County**
**No. 05CR61      C. Creed McGinley, Judge**

---

**No. W2006-02189-CCA-R3-CD  - Filed January 18, 2008**

---

The defendant was convicted by jury of possession of .5 grams or more of a schedule II substance (cocaine) with intent to sell or deliver, a Class B felony.  For his conviction, he was sentenced to ten years imprisonment.  In this appeal, the defendant presents four issues for review: (1) whether the trial court improperly admitted evidence of a prior un-indicted drug sale at the defendant's residence in violation of Rule 404(b) of the Tennessee Rules of Evidence ; (2) whether the trial court erred in failing to include the defendant's special instruction in the jury charge; (3) whether the evidence was sufficient to support his conviction;  and (4) whether the defendant was denied his right to a fair and impartial jury verdict due to improper extraneous influences on the jury's deliberation.  Finding no errors requiring reversal, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J.C. MᶜLɪɴ, J., delivered the opinion of the court, in which Tʜᴏᴍᴀꜱ T. Wᴏᴏᴅᴀʟʟ and J. Cᴜʀᴡᴏᴏᴅ Wɪᴛᴛ, Jʀ., JJ., joined.

Benjamin S. Dempsey, Huntingdon, Tennessee, for the appellant, Richard Wayne Hampton.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; Robert "Gus" Radford, District Attorney General; and Stephen D. Jackson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

The following evidence was presented at the defendant's trial.  Detective Timothy Meggs of the Carroll County Sheriff's Department testified that he executed a search warrant on the defendant's residence on June 23, 2004.  Detective Meggs recalled that the warrant was issued as a result of an undercover drug purchase at the defendant's residence.  According to Detective Meggs, he made copies of the money to be used in a drug purchase.  A confidential informant was then given

the marked money. The confidential informant went into the defendant's residence and after he came out he was no longer in possession of the marked money; but instead, he had crack cocaine in his possession. Detective Meggs recalled that he maintained a visual on the confidential informant while he entered the defendant's residence and after he left. A few days later, Detective Meggs obtained and executed a warrant to search the defendant's residence.

Detective Meggs testified that as he and other police officers initiated the search of defendant's residence, he observed a man working under the hood of a green Chevrolet truck. At the time, Detective Meggs asked the man if he was Richard Hampton and the man responded that he was not Hampton; Hampton had gone into town to get a part for the truck. Detective Meggs also observed another man standing about twenty-five yards away from truck. This man also denied being Hampton.

Detective Meggs testified that he knocked several times on the door of the defendant's residence and announced that he was with the sheriff's department. When no one answered, he again asked the man standing by the truck if he was Richard Hampton or lived at the residence. Detective Meggs also informed the man that he would have to kick in the door to execute the warrant if the man had no key. Again, the man denied being Hampton and said he did not live at the residence. However, after securing the residence, the man standing by the truck was searched and subsequently identified as Richard Hampton, the defendant.

Detective Meggs recalled that he and other officers searched the defendant's residence and found the following items inside: a .22 rifle, a police scanner, and business cards, stating "Richard Hampton, What U Need I Got 24 hours, seven days a week." Detective Meggs noted that the business cards also had the defendant's home and cell phone numbers on them. Detective Meggs stated that while he was conducting a search of the defendant's residence another officer walked a drug-sniffing dog around the vehicles parked at the residence. The dog alerted the officers to the front area of the truck where the defendant had been standing. Detective Meggs stated that he began to search different components under the hood of the truck for drugs because he had observed the defendant leaning under the hood when he and other police officers arrived. While searching the truck's components, Detective Meggs noticed brake fluid outside of the brake fluid reservoir. Upon opening the lid on the fluid reservoir, he saw a baggie with a "hard rock-like substance inside of it." A field test was conducted, and the substance tested positive for crack cocaine. According to Detective Meggs, the crack cocaine was "saturated with brake fluid" so he removed the cocaine from its original baggie and placed the cocaine on some towels to clean it up. He then placed the cocaine in another bag and sent it to the Tennessee Bureau of Investigation (TBI) for analysis.

Detective Meggs testified that after discovering the crack cocaine, the defendant's wallet was seized and $1,010 was found inside the wallet. Detective Meggs compared the serial numbers of the cash found inside the defendant's wallet with the serial numbers recorded from the marked money used to make the drug purchase a few days earlier. Detective Meggs discovered $50 of the "buy money" inside the defendant's wallet. Detective Meggs noted that the truck where the cocaine was found was registered to the defendant. Detective Meggs further noted that after questioning the

defendant and the other man, it was determined that the other man was in the process of mowing the defendant's yard, and therefore, he was not arrested.

On cross-examination, Detective Meggs stated that when he initially pulled up he observed the defendant at the front of the truck leaning over it. He also could see that the alternator had been removed. Detective Meggs also estimated that the street value of the amount of cocaine found in the defendant's truck was between $40 and $150. Detective Meggs acknowledged that a $20 amount is a typical one-time use and the amount found in defendant's truck could be a two-time use amount. Detective Meggs also acknowledged that someone else could have been living at the defendant's residence. Detective Meggs could not recall if he asked the defendant if he was Mr. Hampton or Richard Hampton.

Police Officer Ricky Wade testified that he was a K-9 officer with the Carroll County Sheriff's Department. Officer Wade said that he observed the defendant leaning over the front of the truck. Officer Wade recalled that the defendant was specifically asked if he was Richard Hampton, and the defendant stated he was not. Officer Wade walked the dog around the defendant's truck and the dog alerted when it came around to the front of the truck. Officer Wade confirmed that the defendant was later identified as Richard Hampton.

TBI Agent Erica Kathryn testified that she analyzed the crack cocaine found in the brake fluid reservoir. Agent Kathryn testified that it weighed 1.1 gram. Agent Kathryn could not recall if there were other substances on the cocaine. However, she stated that she would not have reported any substance on the cocaine unless the substance interfered with her analysis of the cocaine. On cross-examination, Agent Kathryn testified that she did not report anything unusual about the crack cocaine other than it had a dark yellow color.

Richard Hampton, the defendant, testified that he had worked at a factory for twenty-one years but was currently working for the city. The defendant testified that on June 23, 2004, he had just finished working a shift and got home around 4:15 p.m. When he first got home, he raised the hood of his truck to change out the alternator. A neighbor, Vasquez Yarborough, came over to help. The defendant explained that Mr. Yarborough also helped him with his lawn service. The defendant also noted that his brother, Rodney Hampton, came by his house around the same time. A little while later, the police arrived.

The defendant testified that while he was pulling the alternator off his truck, Mr. Yarborough was standing on the driver's side of the truck close to the brake reservoir. As the police were coming up the street towards the defendant's house, Mr. Yarborough acted stunned and walked off behind the truck toward the other side of the house. After the police pulled up, they asked the defendant if anyone was inside the house and he told them, no. The police then asked if Mr. Hampton was home. The defendant, believing that the police were referring to his brother, told them that he had gone to town to get an alternator. After that, the police kicked down his door without asking for keys. The police officers searched his house for 15 to 20 minutes while he stayed outside talking to Officer Wade. The police officers then came back outside "dillydallied around a bit and then went back

in[side]" where they stayed for about 40 minutes. The defendant said that when he went back into his house that night it was "ramshackled pretty good."

The defendant stated that the message on the business cards referred to his lawn care and handyman businesses. The defendant stated that, when the police arrived, he was positioned closer to the passenger side of the truck working on the alternator while Mr. Yarborough had been standing closer to the brake fluid reservoir on the driver's side of the truck. The defendant asserted that he could not reach the reservoir from where he was working on the truck. The defendant also asserted that the money in his wallet was from a recent withdrawal from his credit union account for the purpose of getting some work done on his house. As proof, the defendant entered into evidence a bank withdrawal slip for $1000, dated May 4, 2004. The defendant further asserted that the marked money probably came from Mr. Yarborough who gave him some money that day to pay back a loan. The defendant denied using drugs and stated that he tested negative for drugs two days after the arrest.

On cross-examination, the defendant admitted his ownership of the truck where the crack cocaine was found. He also admitted to being the sole occupant and owner of his residence that was searched. He noted that his brother, Rodney Hampton, drove by his residence but did not stop.

## ANALYSIS

### *Rule of Evidence: 404(b)*

The defendant first contends that the trial court erred in admitting evidence of a prior un-indicted drug sale at his residence in violation of Rule 404(b) of the Tennessee Rules of Evidence. The defendant also contends that the court did not cure the error by instruction; but rather, the court made it worse with its supplemental instruction. In rebuttal, the state argues that the evidence of the prior drug sale at the defendant's residence was relevant to prove his possession of the drugs and intent to sell or deliver the drugs – essential elements of the indicted offense.

Pursuant to Tennessee Rule of Evidence 404(b), evidence of other crimes, wrongs, or acts is generally not admissible "to prove the character of a person in order to show action in conformity with the character trait." The rationale underlying this rule is that the admission of such evidence carries with it the inherent risk of the jury convicting the accused of a particular crime based upon his bad character or propensity to commit the crime rather than the strength of the evidence. *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994). The risk is greater when the accused's other bad acts are similar to the crime for which the accused is on trial. *Id*.; *see also State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996). Nonetheless, evidence of other crimes, wrongs or acts may be admissible where it is probative of a purpose other than the accused's propensity. Tenn. R. Evid. 404(b). Although Rule 404(b) does not explicitly list the exceptions under which evidence of prior crimes, wrongs or acts may be admitted, our courts have held that such evidence may be admissible to show another purpose such as: motive, intent, guilty knowledge, identity of the defendant, absence of mistake, or the existence of a common scheme. *See, e.g., State v. Berry*, 141 S.W.3d 549, 582

(Tenn. 2004); *Collard v. State*, 526 S.W.2d 112, 114 (Tenn. 1975). To admit such evidence, Rule 404(b) specifies the following:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Should a review of the record indicate that the trial court substantially complied with the requirements of Rule 404(b), the trial court's admission of the challenged evidence will remain undisturbed absent an abuse of discretion. *State v. James*, 81 S.W.3d 751, 759 (Tenn. 2002); *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

In a pretrial hearing, the trial court found that the prior drug sale at the defendant's residence was probative of why the defendant's residence was searched for drugs, i.e., the basis of the search warrant and the investigation. The court specifically limited the testimony of the prior drug sale by stating, "The officer can testify[,] I gave money to a person [the confidential informant], that person came back and gave me drugs. . . . I wrote serial numbers down." The court also noted that the reference to the defendant's residence did not necessarily implicate the defendant as a participant in the prior drug sale. Later, during the trial, the court instructed the jury that it could only consider the evidence of the prior drug sale at "170 Cozart Avenue . . . for the sole purpose of showing the basis of probable cause for the issuance of the search warrant. This evidence may not be considered by you [the jury] to determine guilt or innocence of the defendant for the crime for which he is on trial."

Upon review, we discern no abuse of discretion by the trial court in admitting the evidence of a prior drug sale at the defendant's residence. This court has previously noted that evidence of prior drug sales is probative of the defendant's knowledge and intent to possess drugs for resale. *See State v. Allen Jean Stephens*, No. M2004-00531-CCA-R3-CD, 2005 WL 1541850, *4 (Tenn. Crim. App., at Jackson, June 23, 2005), *perm. app. denied* (Tenn. 2005); *State v. Roger M. Staples*, No. M2003-01433-CCA-R3-CD, 2004 WL 1337265, *4 (Tenn. Crim. App., at Nashville, June 14, 2004); *State v. Maurice Lashaun Nash*, No. W2000-02971-CCA-R3-CD, 2002 WL 1482731, *5 (Tenn. Crim. App., at Jackson, Feb. 8, 2002), *perm. app. denied* (Tenn. 2002); *State v. Johnny Wayne Tillery*, No. 01C01-9506-CC-00182, 1998 WL 148326, at *6 (Tenn. Crim. App., Nashville, Mar. 30, 1998), *perm. app. denied* (Tenn. 1998); *see also State v. Little*, 854 S.W.2d 643, 649 (Tenn. Crim. App. 1992). In the instant case, the defendant was indicted for possession of cocaine with intent to sell or deliver. Hence, the evidence of a prior drug sale with "marked money" at the

defendant's residence was probative of the defendant's possession of cocaine and the defendant's intent to sell or deliver the cocaine. Furthermore, contrary to the defendant's assertion, the danger of unfair prejudice was diminished by the court's instruction to the jury. Jurors are presumed to follow the instructions of the trial court. *See Little*, 854 S.W.2d at 649. It is our view that the probative value of the evidence outweighed the danger of unfair prejudice to the defendant. Therefore, the evidence of the prior drug sale at the defendant's residence was properly admitted in substantial conformity with Rule 404(b). The defendant is not entitled to relief on this issue.

### *Special Jury Instructions*

The defendant next contends that the trial court erred in refusing his request for special jury instructions. Specifically, he argues that the trial court erred by not instructing the jury that a defendant's mere presence in a location where drugs are found or association with someone in possession of drugs, is not, alone, sufficient to support a finding that the defendant was in possession of the drugs.

In criminal cases, a defendant has the right to a correct and complete charge of the law. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). Thus, it follows that the trial court has a duty to give a complete charge of the law applicable to the facts of a case. *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). The failure to do so deprives the defendant of the constitutional right to a jury trial. *Garrison*, 40 S.W.3d at 432. In evaluating claims of error in the jury charge, this court must review the charge in its entirety and read it as a whole. *State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004). A jury instruction is considered "prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997). Notably, when jury instructions fully and fairly state the applicable law, a trial court is not required to provide special instructions. *State v. Mann*, 959 S.W.2d 503, 521 (Tenn. 1997); *State v. Kelley*, 683 S.W.2d 1, 6 (Tenn. Crim. App. 1984).

In the instant case, the record reveals that the defendant properly filed a written request for special jury instructions. *See* Tenn. R. Crim. P. 30. However, the trial court failed to give these special instructions. Nonetheless, a review of the jury charge in its entirety reveals that the trial court correctly and completely instructed the jury on the law as it applied to the facts of the case, which included the pattern instruction on actual and constructive possession. Because the jury instructions fairly defined the issues of law and did not mislead the jury, the court's failure to include the special instruction was not error. *See State v. Cozart*, 54 S.W.3d 242, 245 (Tenn. 2001). The defendant is not entitled to relief on this issue.

### *Sufficiency of the Evidence*

The defendant next argues that the evidence was not sufficient to sustain his conviction for possession of .5 grams or more of cocaine with the intent to sell or deliver. In particular, the defendant argues that the evidence at trial was entirely circumstantial and failed to exclude the possible guilt of Mr. Yarborough, who was also at the crime scene.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

The guilt of the defendant as well as any fact required to be proved may be established by direct evidence, by circumstantial evidence, or by a combination thereof. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In fact, circumstantial evidence alone may be sufficient to support a conviction. *State v. Tharpe*, 726 S.W.2d 896, 899-900 (Tenn. 1987). However, the circumstantial evidence "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *State v. Crawford*, 470 S.W.2d 610, 612 (Tenn. 1971).

To obtain a conviction in this case, the state was required to prove beyond a reasonable doubt that the defendant knowingly possessed .5 grams or more of cocaine with the intent to sell or deliver it. *See* Tenn. Code Ann. § 39-17-417(a)(4), (c)(1). "Possession" may be actual or constructive and may be proven by circumstantial evidence. *See State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001); *State v. Bigsby*, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000). Constructive possession requires proof that a person had the power and intention at a given time to exercise dominion and control over the drugs either directly or through others. *Shaw*, 37 S.W.3d at 903 (citing *State v. Patterson*, 966 S.W.2d 435, 444 (Tenn. Crim. App. 1997)). In essence, "constructive possession is the ability to reduce an object to actual possession." *State v. Ross*, 49 S.W.3d 833, 845-46 (Tenn. 2001) (citations omitted). Notably, a defendant's possession of contraband may be inferred from a defendant's ownership or control over a vehicle in which the contraband is secreted. *See State v. Timothy Tyrone Sanders*, No. M2001-02128-CCA-R3-CD, 2002 WL 1465925, *4 (Tenn. Crim. App., July 5, 2002). However, the mere presence in an area where drugs are discovered, or the mere association with a person who is in possession of drugs, is not, alone, sufficient to support a finding of constructive possession. *Shaw*, 37 S.W.3d at 903 (citing *Patterson*, 966 S.W.2d at 445). The intention to sell

or deliver drugs may be inferred from the amount of the drug possessed by the accused along with other relevant facts surrounding the arrest. *See* Tenn. Code Ann. § 39-17-419. *See also State v. John Fitzgerald Belew*, W2004-01456-CCA-R3-CD, 2005 WL 885106, *5 (Tenn. Crim. App., at Jackson, Apr. 18, 2005) (noting that the jury can infer intent to sell or deliver when amount of controlled substance and other relevant facts surrounding arrest are considered together).

When viewed in the light most favorable to the state, the evidence established that police detectives used a confidential informant to purchase drugs from the defendant's residence. The police detectives recorded the serial numbers of the money used in the drug purchase. A few days later, the police executed a warrant to search the defendant's residence. Upon execution of the search warrant, the police detectives discovered a .22 rifle, a police scanner, and business cards, stating "Richard Hampton, What U Need I Got 24 hours, seven days a week." The defendant lived at his residence alone. When the police detectives first arrived at the defendant's residence, they observed the defendant working under the hood of his truck. Another man, Mr. Yarborough, was standing about twenty-five yards away from the defendant's truck. Eventually, crack cocaine was found inside the brake fluid reservoir of the defendant's truck. After the defendant was searched, police found $50 of the marked "buy money" inside the defendant's wallet along with about $1,000 in cash. While the defendant suggested that the cocaine found in his truck was Mr. Yarborough's and not his, it was the jury's prerogative to accredit witness testimony and weigh the evidence. In this case, the jury could reasonably infer from the evidence that the defendant exercised constructive possession of the cocaine with the intent to sell or deliver it. Accordingly, we conclude that the evidence was sufficient to sustain the defendant's conviction and he is not entitled to relief on this issue.

### *Juror Misconduct During Deliberation*

The defendant next raises a variety of challenges to the jury's verdict. In challenging the verdict, the defendant essentially argues that the jury was unable to render an impartial verdict because: (1) the jury improperly considered extraneous information of the prior un-indicted drug sale at the defendant's residence and the defendant's subsequent possession of the "buy money" from said sale; (2) the jury improperly considered the extraneous fact that the defendant was on probation/parole; and (3) the jury was initially deadlocked but reached a quotient verdict due to the cold temperature in the jury room.

After the defendant's trial, the defendant filed a supplemental motion for a new trial, alleging undue influence upon the jurors. Attached to the motion were affidavits from Jurors Cook and King, stating the following: (1) the jury vote was initially divided – 9 guilty and 3 not guilty; (2) the jury discussed the evidence of the prior sale of drugs occurring at the defendant's residence despite instruction not to consider this as evidence of the defendant's guilt; (3) the jury foreman referred to this evidence to pressure jurors to change their vote; (4) the jurors were extremely cold and agreed to reach a quotient verdict so that some jurors could leave the room and go home. The two jurors said that their guilty verdict was the product of these influences. Based upon these affidavits, four jurors were called to testify at the hearing on the motion for a new trial.

Juror Heffner testified that the verdict was unanimous and based on the proof and the law. No outside information or influence was improperly introduced to the jury. He heard no complaints about the jury room being too cold. No jurors discussed a quotient verdict so that some jurors could go home. Juror Horton likewise testified that no outside information or influence was brought to bear on the jury's deliberations. The jury room was cold, but no juror changed their vote because of the temperature in the jury room. No juror said anything about the defendant being on probation. A quotient verdict was never discussed. Similarly, Juror Cook testified that the verdict was unanimous and based upon the law and the evidence. No outside information or influence was brought to bear upon any juror. Juror Cook did not remember any talk about a quotient verdict, but he did remember that the room was cold. Juror Cook did not remember any information about the defendant's probation being brought to the jury's attention.

Juror King testified that he did not think the verdict was based solely on the proof and the law because there was some "misunderstanding" whether the jury could consider that the defendant was "on probation before or was he charged with a drug a deal before this deal here come up . . . ." However, Juror King noted that "somebody came in and told us we couldn't use that for evidence, whether he was charged before with any kind of crime." Juror King further stated that the jury ultimately made their decision upon the evidence and the law without reference to the prior drug deal. Juror King said that the jury foreman mentioned that he had a truck like the defendant's truck. When asked if the cold influenced the jury's deliberations, Juror King said, "Get it done or we'll freeze to death." According to Juror King, everyone wanted to go home. His vote was initially not guilty, but he changed his vote based upon pressure from other jurors who wanted to go home.

Based on the four jurors' testimony, the trial court found that "there were no outside influences that were brought to bear [on the jury] . . . the case was decided upon the evidence and the law as [the jury] was instructed to do so . . . ."

Tennessee Rule of Evidence 606(b) limits the circumstances under which jurors may be questioned about their deliberations:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

As noted, Rule 606(b) "precludes inquiries into the jury's deliberative process while allowing juror testimony concerning objective incidents or events that constitute external or extraneous influences on the jury." *Caldararo v. Vanderbilt University*, 794 S.W.2d 738, 742 (Tenn. Ct. App. 1990). The rule only permits juror testimony to establish the fact of: "(1) extraneous, prejudicial information, (2) outside influence, or (3) antecedent agreements to be bound by a quotient or majority result." *Id*. Otherwise, jurors may not testify about a verdict, and no affidavit or evidence about a juror may be presented. *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005). The rule draws a distinction between improper external influence, such as exposure to news articles/stories, consideration of facts not admitted into evidence, and conversations with non-jurors about the case; and sanctioned internal influence, such as discussions among jurors, intimidation or harassment of one juror by another, a juror's personal experiences not directly related to the litigation, and a juror's subjective thoughts, feelings, fears, and emotions. *See Caldararo*, 794 S.W.2d at 741.

Rule 606(b) and its exceptions represent a compromise between competing public policies. It allows the courts to protect the integrity of the process from verdicts tainted by information outside the record and outside influence. *Id*. At the same time, the sanctity of jury deliberations is protected. *Id*. at 741-42. If the defendant shows that the jury has been subjected to extraneous prejudicial information or improper influence, then the trial court must presume prejudice and the burden shifts to the state to rebut this presumption by either explaining the exposure or proving that it was harmless. *Walsh*, 166 S.W.3d at 647.

Upon review, we note that none of the defendant's allegations fall within the ambit of Rule 606(b), as there has been no showing of improper outside influence on the jury. To begin, the source of the jury's knowledge about a prior drug sale at the defendant's residence was not extraneous. It was part of the trial, and was part of the information each juror collected. It should not have been considered by the jury as proof of guilt and indeed was the subject of a jury instruction to that effect. However, this information was not extraneous and therefore does not fall within any exception outlined in Rule 606(b). Likewise, any remark concerning the defendant's probation/parole status from the prior drug deal appears to be derived from a juror's speculation or misunderstanding and not based on the receipt of extraneous information. Again, the record establishes that the jurors were specifically instructed not to consider this information; they followed the court's instruction on this matter and rendered a verdict solely on the proof and the law. Finally, there exists no proof that the jurors agreed in advance to be bound by a quotient verdict because of the cold temperature in the room. While Juror King stated that he was pressured to change his vote, his statement illustrates his own subjective mental processes; it does not demonstrate that an improper outside influence was brought to bear on the jury. In this case, the jury's discussions that were attested to in the juror's affidavits and testimony were intrinsic to the jury's deliberations and do not constitute jury misconduct. Simply put, there is no evidence that any juror was improperly exposed to extraneous information or outside influence during the deliberation process. Therefore, the defendant is not entitled to relief on this issue.

**CONCLUSION**

Based on the foregoing reasoning and authorities, the judgment of the trial court is affirmed.


_____
J.C. McLIN, JUDGE